Is the appellant ready to proceed? Yes, sir. Is the appellee ready to proceed? Yes, sir. Appellant, you may proceed. Thank you. May it please the Court. Lake David on behalf of Jeremiah Womack. Thank you all for letting me be here today. It's good to represent Jeremiah, a guy from northern Louisiana. He works in the mill. He's working today. I asked him to come. I think he's lost a little faith in the civil justice system. I'm hoping we can get his case back and get his faith back today. He and his wife had saved up enough money to get a $70,000 Skeeter bass boat at XF20. I don't know a whole lot about bass boats, but I've learned more than I need to know for this case. You said it was a $70,000 boat? A $70,000 Skeeter bass boat that he and his wife financed to get. I knew there was a reason I didn't ask. And it's on January 27, 2019, about four years ago, he bought it. Two days later, he takes it out on a sea trial, fairly uneventful. He noticed a tiny bit of slack, a hair, he said, of slack in the steering for about five hours. The manual says take it on 10 hours worth of sea trial before you really take it out and just start doing what you're going to do. Jeremiah is the kind of guy, he's obsessed about this boat forever. He finally has enough money to go get the boat or at least finance it. And he sits down in his living room and reads the manual. He goes back out to the second sea trial. Two days later, he gets it up on plane, starts to ease the boat to the right, this brand-new boat still on sea trial. And the steering, according to his testimony, completely fails. It whips to the right with the experts calling in swap on both cases. The steering fails. The boat whips to the right. He goes flying, has all kinds of injuries, major surgeries he's had. It's changed his life. The last thing he wanted to do was have a litigation. He was anti-litigation when he came to see me. I said, well, look, this is what this law is for. And so what happens is he gets himself off the bottom of this boat and he idles it back into shore. Fortuitously, Greg Williams is there at the scene, and they both check the steering. And the steering on this brand-spanking-new Skeeter Bass boat, you could turn it half or even three-quarters of the way. That's their testimony. And not get any response in the steering unit. That's the testimony. That's the issue of fact. Then Jeremiah Womack, being the prudent boat owner that he is, this brand-new boat, takes it to the local Skeeter dealership in Monroe, which is Morris Marine. They're a certified Skeeter dealership, a certified Skeeter repair shop. That shop, the repair, the certified Skeeter Marine says they've never seen a wheel with so much slack in it. This brand-new boat. Morris Marine tries to fix it. They're the fixers. They take it out on their own sea trial, and it still has so much slack and is jumping so much, they said this is not safe to be used. And they have it shipped to the Skeeter factory in Texas. This was all the same month. This all happened in February of 2019, four years ago. Jeremiah Womack picks it up from the Skeeter factory. The person there, a guy named Josh Bailey says, hey, Jeremiah, you know, that steering problem you had, the check valves were sticking in it, and that every time you started to move the wheel, it was actually adding air to the system. That was the problem. And what Skeeter did is they didn't fix it. They took it off. They sent it to Dometic, the manufacturer of the actual steering system, and the entire unit was replaced, and the defective broken unit was thrown away. Now, Skeeter and Dometic will say it was fine, and we looked at it. Issues of fact. Their own certified dealer repairer said it was the most slack they'd ever seen in this brand new boat. And, in fact, when we took the corporate deposition of Skeeter, even the company said possible faulty helm was the problem with this boat. And I'm talking about facts here and not law. I usually think when I'm talking with you folks, we're going to talk about the law, but this is about facts. This should be at the district court level. The Louisiana Product Liability Act is kind of a beautiful thing. It's pretty simple. And when you look at the law and you say, hey, did this boat and its steering system, did it deviate from the manufacturer's specifications? Steering's got to steer. You have two people at the scene of the incident talking about the steering not working. They take it over to Monroe to a certified dealer. They say it's the most slack they've ever seen in a wheel. I understand you're here on arrest of soloquitor theory? Yes, sir. So do I also understand correctly your expert came up with a couple of different possible causes and eliminated some of them? Exactly, yes, sir. So what's left of the causes that could have taken place? It's not user error, according to your expert, and it's not weather. It's not the water conditions. Exactly. So what's left is a faulty steering system. Whether it was air in the steering system, the steering system failed. And that's what caused this. And that's what he opined. And he has several different things. He never got to look at the steering system. And we cited the law to your honor. Was there also a reference to the possibility that there was not enough hydraulic fluid? Yes, sir. There's a reference to that as well. Is that a defect theory or a different kind of theory? Why would there be insufficient hydraulic fluid? It could be that the way that this particular device was installed was improper, either created by Dometic or installed by Skeeter in the final package that was sold to Jeremiah Womack. What's important to know is he bought it from a Skeeter dealership, brand spanking new, everything installed. This was a sale direct from the manufacturer. There's no retailer here, right? There actually is a retailer, yes. A retailer I think in Memphis, Tennessee he bought it from. Okay. For some reason I thought you were buying it direct from the manufacturer. Well, let's go with that then. Yes, sir. It would seem to me that if you don't have hydraulic fluid in the boat, that's a problem. Is it a manufacturing defect or is it a different legal claim? Under the Louisiana Product Liability Act, it's absolutely a manufacturing defect. Again, you have to realize we're under the guise of a brand new boat that has not been altered, has not been repaired, and all it's done is going through its sea trial phase. So was that steering intended to be, did it deviate from the manufacturer's specifications or from the performance standards of the other products? Let's stick with the hydraulic fluid issue. And maybe you are, I'm just not familiar with the boat. Sorry? Let's stick with the hydraulic fluid issue. Yes, sir. Maybe that you are, and I'm just not familiar with the boating terminology. I apologize. But I'm taking your expert at his word because we're at summary judgment, and the theory is it could be defect or it could be inadequate hydraulic fluid. What I'm trying to figure out is maybe the seller should have provided that fluid as part of a saleable boat, but why is that a manufacturing defect? It seems to me that whatever that is, it may be a legal claim, but it's not a manufacturing defect, is it? It is for a brand new boat. If I sell you a brand new boat and the hydraulic line is not connected, that's on you, the manufacturer. If I sell you a brand new boat and the hydraulic line has too much air in it because it's not tight enough, that's on you. If it's leaked out because it wasn't tight enough because there's some leak in the hose, that's on the manufacturer. Now, if you get further down the line and it's 10 years down and there's repair shops and there's warranty issues, that's kind of a different inquiry. But here we are on the front end. Is there any evidence in the summary judgment record as to whether somebody simply forgot to put the fluid in or that they put it in but it leaked out due to a defect? We're silent on that? Not that I'm aware of, no, sir. And that's why it makes this one so clean and easy is because it is a brand new boat, and they took the system and threw it away, the defectors, and replaced it. Presumably, if it was a good system, it would still be there. They replaced the entire system free of charge, charged Jeremiah Womack nothing, gave him his boat back, and it's worked with the new system. It didn't work, lots of evidence, with the system that came on it as the original part of the boat. And that's why the Louisiana Product Liability Act makes it so simple. Did this steering system deviate from the manufacturer specs or from the performance standards or from other like their other products, their other steering systems? Yes, it did. It's not supposed to do that. It's supposed to be tight. Whether it's air in the system or a lack of hydraulic fluid or a lack of hydraulic fluid getting where it needs to get, it's a brand new boat. It's on the manufacturer here. This is still in the sea trial phase. And then if you look at the case law that we talked about, was it an unintended abnormality? Yes, that's exactly what this is. Was it more dangerous than design? Yes, the steering's not working. It's on the manufacturer. And Skeeter has admitted that they're the manufacturer for all purposes of these proceedings. And you're right. The expert said, I wish I had it to look through. I could tell you exactly where the hydraulics failed. We know that the Skeeter dealer who looked at it first said it had all that slack, and they tried to fix it and they couldn't even fix it. And we know, based on Jeremiah Womack's testimony, that Skeeter told him that the check valves were sticking in it and that every time you started to move the wheel, it was actually adding air to the system. That's a very likely cause, and the jury can rely on that. But you talked about Ray Sipsa. I hate to be in the Fifth Circuit talking about Ray Sipsa because I always think Ray Sipsa's a last resort. But in this case, it's not. And the district court and the defendants keep saying, you can't just say there's an accident, Ray Sipsa, you win. And that's not what the plaintiffs are saying. The plaintiffs are saying it's way more narrow. The plaintiffs are saying this steering system, based on the evidence we have, failed. And you can't come to me and say, hey, you tell me exactly how it failed after we got rid of it. No, that's where Ray Sipsa comes in. It's very narrow as to which part of the steering system failed. That's on you. It's a brand-new system. It's not supposed to whip around and almost kill people. Jeremiah Womack's affected for life, multiple surgeries. Still working. He's that kind of guy. Counsel, you said that Mr. Womack sat down and read through the manual. Yes, sir. Refresh my recollection. Is the manual in the summary judgment record? I'm pretty sure the entire manual is. There's definitely an excerpt to the manual. The relevant excerpts are definitely in. I can't remember if the entire manual is in. Does the manual say, you know, when you buy a new boat, the user needs to make sure there's enough hydraulic fluid in it. If there's not, add it. Like when I bought a weed eater the other day and I had to make sure there was enough oil in it. You caught me flat-footed, Your Honor. I can't remember it saying that. That hasn't been an allegation that's come up in this case. I'm just asking. So I don't know. Presumably, I don't know. But there are all kinds of things you do. And Jeremiah Womack was pretty doggone good at checking off the list of what you do. I'd like to think I would take it on a 10-hour sea trial. I've never owned a $70,000 bass boat, nor will I ever unless I want to not be married anymore. And I don't know, if you go through the manual, it says, well, you better make sure that the air has been properly purged from the hydraulic fluid. I don't know. In this case, there are no allegations that he didn't follow the checklist for starting up. The one allegation they have is, hey, when he noticed on the day this happened, he said there was a little play. And I've never had a bass boat, but I've operated boats before. There's often a little play in a boat. And the manual says when you have that, you turn all the way to the right and all the way to the left. That's exactly what he did, and it was tight. And that's what he did. So they're saying, well, wait. And, in fact, that's what's so funny. They say, hey, under the warnings and the inconsistent warnings, because they have some inconsistent warnings on the boat and the manual that don't really make much sense when you compare them. I'm not going to get into that detail. You'll have that. But one thing that they say in an upside-down world, they say, hey, when he noticed that little bit of steering defect, he should have known the boat was defective and dangerous and not used it. Well, they lose under construction and composition, under that scenario, because if there's something wrong with it, okay, they're saying he can't use it, but if there's something wrong with it, they lose. There's issues of fact all over the place that this brand-new boat that he's probably still paying for was not working as intended by the manufacturer, and it was more dangerous. Yes, sir. Are you sure that your own expert offered about four different reasons as to how this event could have occurred? I think what he did is offer three different, Your Honor, if I remember correctly. One was that basically a steering failure. Well, he said a wave. Yes, sir. He said user input. He said air entrained in the hydraulic system, and then he said a mechanical problem with system components. Fair enough. That'd be four. Breaking up those two, the system failure that broke, there's two in his report. I was kind of counting them as one right there. And the other two options were a wave. There's no evidence that he hit a wave. This is a guy who's been operating boats for 30 years, a 47-year-old guy operating boats for 30 years, his whole life, has other boats. He's not going to just whip the wheel right or left while he's going on plane in his brand-new boat. As regards to those four, under Louisiana law, don't you then have to exclude all other reasonable hypotheses with a fair amount of certainty? Isn't that what the law requires you to do in order to be successful on a race? Yes, sir, Your Honor. And, again, when you talk about on a whole accident, the answer is yes, and we think we have one, a global one, yes. There's no waves, no testimony that he saw waves or felt waves or anything else. He's never said that. And, two, when it comes to the – what was the other one? We got user input. User input, that's what I said. For user input, there's no evidence that he somehow went the wrong way or lost control of the boat. He said he's operating it, and he starts to gently steer to the right and loses all control of steering, and it does this in-swap on him. So there's no testimony to say user error. There's no testimony from any of the witnesses out there to say it was a really wavy day. It was some light chop. Some of their experts opine that maybe it was a wave that caused it, but there's no evidence of that. But then when you – that's in the – in Globo, there's an accident. Let's look at what caused it. But I'm telling you, my thought is when you look at the race IPSA in terms of the – what we know we have evidence of, that the steering system wasn't working, that's where the race IPSA comes in, and there's no evidence whatsoever. However, he offers four potential causes. Yes, sir. And you're saying that the evidence, by way of examination of all of the circumstantial evidence, you can eliminate all save one. Exactly. All right. And which one – All of save is failure of the system, yes, sir. All right. And the one that remains is that the system failed. Yes, sir, because there's no evidence from Jeremiah Womack that he did anything untoward operating the boat to make it steer incorrectly. So user errors out, and our experts did the same thing. There's no evidence of that, and there's no evidence that some rogue wave came and hit him and knocked him to the side either. But your expert didn't conclude that he could determine that it was due to a product defect, did he? Did he offer that expert opinion? He thought the most likely cause was the fact that the steering system failed. But he left open – he said, look, for it to do this, to do an in-swap like this, only three things can cause it. Steering system fails, somebody basically user error, just yanks the wheel to the right or left, or a big wave hits him and knocks him this way to do an in-swap like this. And that's what he said, and there's no evidence for the other two. He didn't say he thinks it could really be this. There's no evidence to support that there was a rogue wave on this lake or some big wave on this lake that caused the boat to change course. Nor did he opine that Jeremiah Womack – there's any evidence anywhere that he yanked the wheel. This 30-year experience guy in his brand-new boat is going to yank the wheel and cause himself to go flying across the boat. He put out all his report, and I know they're relying on that. And we don't have to exclude everything for Ray Simpson in this case because, again, the evidence in this case is that the steering system failed. Remember, their certified dealer says it failed. Send it back to the company because they couldn't fix it because it failed. And when you look at Ray Simpson in that narrow instance – I thought there was some evidence in connection with that, that that employee may have been referring to a different boat altogether. Is there some evidence of that? There is. When Skeeter was deposed and they were deposed, they said they were talking about a different boat. This was his – Josh Bailey's words to Jeremiah Womack's mouth. That's Jeremiah Womack's testimony. That's an admission against interest by Skeeter. Skeeter has said, no, we were talking about a different boat. And somehow the district court, in its opinion, said they're accepting Skeeter's version and discounting that completely. That's impermissible. That's an issue for the jury. I want to save a little bit of time if I can, Your Honor. Any other questions you all have? Thank you, Counsel. Thank you all so much. I appreciate it. Good afternoon, Your Honors. I'm Mike Horowski for Dometic Corporation. Before I get into the meat of some of this, I want to just touch on what we were discussing with the res ipsa, okay? You hit on it right on ahead. There's a couple requirements for res ipsa to be applied, okay? One is that the product in traditional res ipsa, the product has to be within the control of the defendant against whom res ipsa is sought to be applied. Here, it's the exact opposite. The person who's trying to allege someone else's fault via res ipsa is the one actually in control of the boat, okay? Not only is his control of the boat a plausible cause of the accident, I think that's quite clear. But he also, as you said, needs to eliminate all other potential plausible causes. And he hasn't, not only has he not done that, he's affirmatively alleged and sued multiple parties on separate allegations of independent fault, right? He's sued my client, Dometic, for saying they manufactured a defective product. He sued Skeeter separately saying that they constructed a defective boat, okay? Those are separate independent bases of potential liability. So how can you just assume that one of those is the cause of the accident? You can't. That's what res ipsa says. I think it's categorically inapplicable in this case. And there's numerous cases talking about that. He cites several where courts find that res ipsa can, in certain circumstances, be applied in a product's liability context. But that's all those cases say. They don't talk about facts like this where the person trying to apply it is controlling the product at the time, okay? Those cases, in my view, are completely separate and have no application to the facts of this case. The second point I want to touch on are these sticky check valves. At the time, there was some confusion early in the discovery process in this case, all right, about these sticky check valves. It came up. But through the course of discovery, it became abundantly clear, undisputed, as the district court found, that those check valves were on a separate boat, all right? Skeeter, at the time that Mr. Womack returned his boat, had another warranty return that they were dealing with at the same time, separate boat, separate incident, separate person. Both boats had potential, you know, were dealing with the helms, the steering system. So Skeeter sent them both back to Dometic at the same time. And the correspondence with Dometic and Skeeter is in the record, and it's abundantly clear which boat is the one with the sticky check valves where you turn the wheel and the engine didn't turn. And it was not Mr. Womack's boat, okay? It's in there with the boat ID numbers in the correspondence. It's all in the record. Mr. Womack's boat was returned at the same time with the comment that, as Skeeter's witnesses testified, they checked the boat and they didn't find anything wrong with it. They came back to Dometic, Dometic checked the equipment and didn't find any problems with it. So I just think that's a, and Skeeter's corporate rep also testified that it was a different boat. He was asked, does this relate to this boat? No. That's a different boat. We were dealing with a different boat at the time, and there was some confusion early on, but that was clarified in the record. It was clarified during discovery, and it's a non-issue as far as Dometic is concerned, okay? Now, going to the construction or composition claim under the LPLA, there's lots of talk about facts of the incident, about what happened. But what, you know, Mr. Womack has failed to do in this case is provide evidence in the record of the elements that are required to pursue a claim under the LPLA for construction and composition. To do so, he has to establish three things. It's his burden to do this, okay? He has to establish first what the specifications and performance standards are for the product, okay? That's a baseline showing because the second obligation is to show that the steering system on his boat deviated from those standards, all right? You can look through the record from cover to cover, all 5,000 whatever pages of it. There's not a single piece of evidence in there talking about what Dometic's specifications and performance standards for this type of hydraulic steering system are. It's just not there. For whatever reason, the evidence wasn't developed in the case, and that alone should eliminate that cause of action, okay? Because you can't go to step two. There's nothing for the fact finder to compare Mr. Womack's steering system against to see whether it deviated or not. They don't have the baseline standard. Second, he also hasn't presented what the deviation is from those standards. As you note, his expert identified a series of hypothetical potential causes for an end swap or a boat turning suddenly, okay? One is the user error. One is the waves. And then the third and fourth are equipment failure, basically, one of which would be Dometic's potential responsibility, right, which is if there was a mechanical defect in it. The other, if there's air in the system or something, that would be on the boat manufacturing side, not the product side, okay? But his expert says, I don't know what it was. These are four things that it could have been. I don't know which one it was. You guys figure it out. That is – If it's a hydraulic fluid issue, what category do you put that one in? I would – well, the – That was one of the four, right? That's sort of. But, yeah, that would be – I think that would be on the assembly side of it, the boat manufacturing side of it, not on the manufacture of the steering system itself. It's sent out without hydraulic fluid in it. Hydraulic fluid is not put in until it's – you know, the system is incorporated into the boat and it's sold as a product. I'm sorry. Your theory is of the third and fourth categories of possible cause, you're agreeing that they're both defect issues. It's just which defendant. That's the problem. If it's three, it's one defendant. If it's four, it's the other defendant. I think that's a fair statement, I believe, yes. But what's missing is any evidence that either of those was present on this boat. We asked his expert, and he said, I don't know. I don't know that these were present. These are things that could have caused it, but I don't have any evidence. I think his words are – I don't – I'm reading his book. They can't pick between three and four, but they know it's three or four. Well, that's what he says. I mean, the other – there's a dispute as to that, of course. You know, all the defense experts say that the most likely cause is user error. But setting that aside for – That's a fact issue for them. Yeah. For purposes of this discussion, if it were three or four, those would be defects. But you still, under the law, okay, have to identify what the defect is you're claiming was present in the product. And I just want to be clear with whether or not you're agreeing that the one having to do with this hydraulic fluid, it would fall under the category of defect because, as I understand it, and I could be – It could be. I could be wrong about it, but I thought when he talks about air in the system, I thought it was correlated with an insufficient amount of fluid. It just read to me as if if it was filled with fluid, then there wouldn't be the air. If the fluid is absent, then the air fills that space. Am I – You're correct. All right. And from – Wait a minute. I really want to make sure this is clear. Yes. If that's the right theory – I know that's a dispute, but if that were the theory, then you're agreeing that is a defect, it's just the other defendant? Well, I'm agreeing it's a potential defect. Correct. But, yeah, I think that would be on the boat manufacturer side of defect. Okay. So is the idea then, again, understanding this is summary judgment, taking the facts in the non-movement's favor, there's a defect here. It's just not clear whose defect, and that's what trial should be about, is the two of you guys can point to each other. No. Well, no, Your Honor. I would respectfully disagree with that. Figure it. That's what I want to know. No, no. I think – I think what this expert is saying, but what he's saying is there's no evidence that that defect is present on this boat. Okay? He doesn't have evidence. He's just saying that's something that can cause this type of event, but he doesn't have – there's no evidence in the record that it's present in this case. Because I'm just having a real problem concluding that the absence of fluid is a manufacturing defect. I mean, y'all may agree that it is, but it sounds like if there's an absence of fluid, then the presence of fluid fixes that. That's not a manufacturing defect. That's somebody pouring in whatever you do on a $70,000 boat to get fluid in it. Correct. Correct, Your Honor. That's a servicing issue. Yeah. Yes. But when the boat – when the brand-new boat arrives, is it supposed to have hydraulic fluid in it or not? Yes, it's supposed to have hydraulic fluid. I mean, I'm looking here at – I think this is an expert report that says the fluid level should be checked periodically to determine the correct level for hydraulic steering. Okay. But when you get the new boat, it should have hydraulic fluid in it. I believe in there it might say you should check it every time. I'm not – I haven't read that manual. I guess for me it's this. Yes, sir. I do have a car. And when I buy it, I don't expect to put oil in it the day I drive it off the lot. I expect that somebody's put oil in it. But if there's no oil, I don't know that I'd conclude that that's a manufacturing defect. Somebody's responsible for putting some oil in an engine before it leaves the lot, maybe at the plant where they manufacture it. I don't know who does that. But it doesn't sound like a manufacturing defect if there's an absence of it. I wholly agree, wholly agree. And if I may make one more point real quick is you made a good point. It's at the time it leaves the manufacturer's control that's relevant. The only evidence in the record, the only evidence in the record of the condition of the steering system when it left Dometic's control is the testing. It was tested by Dometic on specially designed equipment to make sure it met its performance standards and specifications and was found to have met those standards. That's the condition it was when it left Dometic's control, and that's the only evidence on that issue. It looks like I'm out of time unless you have any other questions. Good afternoon, Your Honor. Joe Glass representing Skeeter Products, Inc., of Pelley in the matter. If it may please the Court, I'd like to pick up where Mr. Horowski just left off. It is a very important point that it's the plaintiff's burden to establish that there was a defect at the time it left the hands of the manufacturer, and I believe that was the fundamental basis that the district court relied upon in granting this motion for summary judgment. So we've gone through an entire two years of litigation. Depositions have been taken. We've had documents collected. We had expert reports, and at that point, the record was made. We're a month from trial, and the court looks at the cold record and says, what is being presented here? And I hear issue of fact, issue of fact, issue of fact, and it reminds me of many, many years ago when I was a much younger lawyer. I happened to be in this court listening to the Honorable Judge Higginbotham, and the same argument was made on a summary judgment that had been granted, and the first question that he asked on the panel was, what question would you have the trier fact answer that makes a difference here? What would you have him ask? The issues that were raised are irrelevant to what the court found to be lacking in the plaintiff's case and the appellant's case. The plaintiff has shown no evidence of what the standards are, not only for the individual component of this boat, Dometic's steering system, but for the boat itself, let alone how it deviated. So the question is, what's been argued here today before the court is how, okay, so the accident happened. It's a brand-new boat. We know it left the hands of the manufacturer from Dometic, as you just heard, with no problem. It left the factory at Skeeter once it was put into the boat, and that was tested. There's a video showing the hydraulics being turned and the engine turning with the steering wheel. This was all given to the plaintiff. The plaintiff didn't ask those questions of the Skeeter representative. Then it goes to a dealer and sits on a lot for months. They test it. There's testimony from anglers who sold this boat that they tested it, no problems with hydraulics, all the fluids were checked, everything's fine. Then it's sold to the plaintiff, and he takes it out  But then says, you know, I noticed something's wrong with the steering at the end of my first trial run. He calls back the dealership and announces that, and there's no dispute. He read the manual. He calls the dealer, tells the dealer there's an issue. The dealer says, take it to a dealer to be checked out. And, of course, we know from the manual, the manual says, don't use the boat if you have any issues with the steering, and you check it every time before you go. He goes back out for a second run, and he says, this is his testimony. He says, I had to turn it one to two minutes to make it so it would finally turn and back. He notices another issue, one to two minutes. Think about that, how long one to two minutes is trying to get steering. And then goes out and goes 40 miles an hour, full plane, on the waterway. If you're accepting what the plaintiff says is true, which you're supposed to do on motion for summary judgment, he's not using the boat according to what he's supposed to do under the manual, what he's warned to do, have the boat checked, and what he was told to do. That's not admission that there's a defect. That's an admission that something was going on for whatever reason and the time after it left the hands of the manufacturer, and if that's the position the plaintiff wants to take, he's not using the boat in a reasonably anticipated use. It's in violation of a warning in the manual for this very circumstance. That sounds like you're saying there might have been a defect, but they failed to mitigate. I think, Your Honor, it's close to what I'm saying, but not exactly. What I'm saying is if that's the position the plaintiff's taking, then yes, he's using it in violation of a manual. I don't know what was happening on that day, and that's the fundamental problem here. We're left with the argument of the plaintiff. It should be res ipsa because it's a boat that's relatively close to the day it was sold, or my guy's hurt and we have two big corporations, and so this is a sympathy play, and the first thing we tell the jury when they try this case is, or if they would try this case, is you try it on evidence, not on sympathy. And what is the evidence before the court? What's your take on this hydraulic fluid issue? So the hydraulic fluid issue, and I did take issue with that a little bit, Your Honor. I'm glad you bring that up. The third and fourth points that you all have discussed here today were actually just the first question from the expert. The expert, Ken Smith, at that point then says it could be one of six things. It could be the hydraulic fluid. It could be air in the system, and it could be a bunch of other mechanicals, and I agree with Your Honor. What's going on with the hydraulics? Well, that's something you're supposed to check every day. It has a little valve that you can open up and you can look at it. I don't know what the plaintiff is doing with the boat in the time that he had it. It could be something from the plaintiff. It doesn't have to be, well, this was at the time it left the hands of the manufacturer. Let's say that was the problem. That's one of the options that the plaintiff's expert is acknowledging. This whole problem could have been the hydraulic fluid. What is that if that's the problem? Is that a defect? At that point, that's comparative fault on the plaintiff, I would argue. For not checking the fluid level. Not checking on it. I don't know if he needed to put some more in, or the dealer checked it, but the dealer puts it in. I don't know. But that is the fundamental problem here. Nobody's identified what this is, and you can't rely on res ipsa. This is evidence day on summary judgment. We have the record. And if the court was to send this back, it goes before the jury. There's no more discovery. So this is the record they're going to get. We're going to have a directed verdict that's going to be granted. When you buy a new boat, everybody understands it's supposed to have enough fluid in there at the time of purchase. At the time of delivery. I'm not sure that, I don't know if I can make that leap of assumption. I don't know if there's been evidence or testimony on that. But presumably, I can tell you from the record, when anglers was deposed, their corporate rep, and the technician who actually looked at the boat said they checked it, there was fluid, and the steering worked fine, there was no problem. The evidence is it was full of fluid at the time of delivery. Correct. How long is it supposed to take before you're supposed to get more fluid? You're supposed to check the fluid every time before you use the boat according to the manual. There's a little valve up by the console, and you're supposed to look at it. It sounds like there was five hours of usage. Is five hours enough to start depleting the fluid, or is it more? I don't believe that information is in the record, Your Honor. I don't know the answer to that. So that goes directly to the point, though. Again, the issue is it's the plaintiff's burden of proof, and here the plaintiff hasn't carried that burden of proof. All the issues of fact that were identified here, that there was a steering issue afterwards according to the plaintiff and according to his friend who drove it back in, and then according to Morris Marine, are all issues that just establish that an accident happened. And just because an accident happened doesn't mean that there's a defect. You can't make that presumption. It's one of the fundamental rules under the LPLA. You have to establish what that defect was. And I'm hesitant to go here because I don't want to suggest that there's an issue of fact, but all of the testimony that was provided by the appellant here today was from Mr. Womack's testimony. I just told you that we had all these depositions. We had technicians. We had corporate reps. We had employees of the defendants. We had eyewitnesses, all deposed. Mr. Bailey didn't say what was raised here today. That was Mr. Womack. Skeeter didn't say what was raised here today as issues of fact. That was Mr. Womack. Morris Marine didn't say what was raised here today. That was Mr. Womack when he was saying it was the most slack that was ever seen. Only Mr. Womack said that. If this was truly an issue of fact, where is the question answered from Morris Marine, presented to your honors, where Morris Marine said that? There has been no evidence presented to this court what the standards are for the Skeeter boat and how they deviated. That's the fundamental flaw the district court identified, and nothing that has been brought up here as an issue of fact will change that determination. There's nothing in the record to establish what our specifications are and how they deviated. Do you have any other questions, your honors? Thank you, counsel. Roboto. In brief response to that, and we cited the record for your honor, record pages 46-42, Morris Marine testified that even after bleeding the hydraulic system, this is I think a day or two after, right when he brought it there, while testing the steering on the water, the steering system was not operating correctly and jumped on them as well. So even after they tried to fix it, it wasn't working. Record page 46-43, Morris Marine testified that after encountering the steering system errors in their test run, they deemed the steering so unsafe that they contacted Skeeter and delivered Jeremiah's boat directly to Skeeter. That's not Mr. Womack's testimony. But everything they just said, what they can't tell you is that's the evidence that the steering failed. If you take that testimony as true, that the steering failed, all their arguments lose. The LBLA, you don't have to get to race IPSA. What's the performance standard? When you turn the steering wheel, it works. And it doesn't fail and completely cause this end. You don't have to get to race IPSA. Yes, sir. So my question is, without a race IPSA claim, do you still have claims? Absolutely. Yes, sir. Without the race IPSA claim? Absolutely. The answer is yes. It's because it's kind of a keep it simple, stupid philosophy my dad always taught me. You don't have to get hyper technical. We don't have the device to say exactly this part of this didn't work. What we have is the testimony and evidence from everybody who saw this boat before it went back to Skeeter that said the steering wasn't working. And that's the performance standard that Skeeter has for its boat and that MEDIC has for its steering system. That when you steer, it steers. If Skeeter is selling a boat that runs out of steering after five hours, they'd be out of that business pretty quick-like. And then how did it deviate? It didn't steer. We satisfy, and we showed you the cases, we don't have to say that the braking system failed because of this. Sometimes planes and boats and cars are so damaged or lost that we don't get to look at what happened and we have to surmise based on the evidence what happened. You don't have to get the race IPSA for that. Our last resort was race IPSA saying, look, if you think just saying the braking system failed like the Skeeter certified repair person said, he said it was so bad they couldn't fix it at the Skeeter certified repair shop, they sent it to the manufacturer who took the braking system, steering system, sorry, threw it in the trash, put a new one on it, sent it back. No charge. No one alleged that he did anything to, I don't know what the issue would be with hydraulics. It very well could have been the hydraulics, but no one alleged that he didn't check it or didn't do what he was supposed to do. The hydraulics, as the medics lawyer just said when he was up here, that's the job of the manufacturer to make sure when they install the next system to make sure it's loaded with hydraulics and ready to go. And then when you start talking about the plaintiff, those are all issues of fact. Whether the plaintiff should have checked this or should have done that, I think the word comparative fault was used. There was issues of dispute between experts that I think your honor raised. It was a fact issue. But that's the crux of the case is the steering failed. We have not just Mr. Womack's testimony, Mr. Williams' testimony and Morris Marine. The certified steel dealer saying this was broken and not working, this five-day-old boat with five hours on it. Was it working? Any other questions, your honor? None. None? Okay. And I guess I don't ever want to leave anything, I guess, undiscussed. When it came to the hydraulic fluid, I know there's a lot of questions about that. Again, the things that would cause hydraulics to not proper work, not having enough hydraulic fluid, manufacturer. There's a kink in the hose, manufacturer. There's an air leak, manufacturer. There's some other issue with this break that's causing the hydraulics to not get what they need to get or there's air getting in there. That's the manufacturer. And I will say this, under Louisiana law, judge, sometimes you can be called a manufacturer when you don't feel like a manufacturer because when they deliver it, they're responsible. And the medics said that about Skeeter. They're responsible for making sure the hydraulic fluid is ready to be before their Skeeter certified dealer sold to Mr. Womack. And anything they want to say about Mr. Womack, not picking it out with a broken steering system or not stopping, that's comparative fault for the jury all day long. That's it. I think I'm done, Your Honor. Any other questions? None. Thank you, Counsel. Thank you, Your Honor. I appreciate it. The court will take this matter under advisement. And we call the next case, which is cause number 22-10371, Communication Workers of America v. Dex & Me.